# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| JONATHAN TRIMBOLI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| OLD REPUBLIC INSURANCE CO., ) | |
| ) | |
| Intervening Plaintiff, ) | |
| ) | |
| v. ) | **Case No. 3:18-cv-00346** |
| ) | **Judge Aleta A. Trauger** |
| MAXIM CRANE WORKS, L.P., ) | |
| ) | |
| Defendant, Third-Party Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| APTUS GROUP USA, LLC ) | |
| ) | |
| Third-Party Defendant ) | |

## MEMORANDUM

Several motions to dismiss, motions for summary judgment, motions for discovery sanctions, and ancillary motions are pending before the court. For the reasons set out herein, the court will grant in  part and deny in part the Motion to Accept and Consider and for Rule 37 Sanctions (Docket No. 157) and the Motion to Dismiss and for Rule 37 Sanctions (Docket No. 97) filed by Aptus Group USA, LLC ("Aptus"), as well as Jonathan Trimboli's Motion for Rule 37 Sanctions (Docket No. 99). The following motions will be denied: Trimboli's Motion for Partial Summary Judgment (Docket No. 82); Trimboli's Amended Motion for Summary Judgment (Docket No. 87); Aptus's Motion for Summary Judgment (Docket No. 114); Trimboli's Motion for Partial Summary Judgment on Affirmative Defense of Loaned Servant Doctrine (Docket No. 118); the Motion for Summary Judgment filed by Maxim Crane Works, L.P. ("Maxim") (Docket

No. 120); Maxim's Motion to Strike (Docket No. 156); and Maxim's Motion for Hearing (Docket No. 159).

# I. BACKGROUND

## A. Aptus Engages Maxim for the Old Hickory Bridge Job

Aptus is a bridge utility construction and demolition company. (Docket No. 148 ¶ 6.) In 2017, Duke Energy and Piedmont Natural Gas hired Aptus to remove an out-of-use natural gas pipeline mounted to the Old Hickory Bridge across the Cumberland River in Nashville. (Docket No. 134 ¶ 1.) Aptus devised a plan for removing the pipeline that relied on suspending Aptus crew members by crane over the side of the bridge, where they could cut and remove the pipe. (*Id.* ¶ 2.) Aptus's methodology would require two cranes: one for the crew member cutting the pipe and another for a crew member to stabilize and remove the pipe. (*Id.* ¶ 3.)

Aptus contacted Maxim, a nationally known company that provides cranes and crane-related operations, in order to obtain the necessary crane equipment. (*Id.* ¶¶ 4–5.) Aptus Vice President of Operations Shawn Snyder spoke on the phone with Maxim's Nashville salesperson, Armando "Al" Martins, and informed Martins that Aptus would need not only crane equipment but also operators and personnel to manage the equipment. (*Id.* ¶¶ 4, 7.) Martins visited the Old Hickory Bridge site at least twice to evaluate it. (Docket No. 138 ¶ 2.) Aptus, citing an Affidavit from Snyder, claims that it was "relying on Maxim's reputation and claimed expertise in order to provide the proper crane equipment, operators and supervision for the job." (Docket No. 134 ¶ 5.) Maxim disputes this characterization of the companies' division of responsibilities, citing testimony that Snyder and other Aptus personnel were overseeing and directing the operation of the cranes. (*Id.*)

Maxim created an internal document known as a Job Planning Data Sheet ("JPDS") to describe the job. According to the JPDS, Maxim would provide the crane equipment, operators, fueling, maintenance, and rigging for the project. The JPDS also states that Maxim employee John W. "Wes" Fisher would serve as "Operator's Foreman" for the crane operators. Maxim maintains that the JPDS was merely an internal form and was not part of any agreement with Aptus about which entity had responsibility for overseeing the Old Hickory Bridge project. (*Id.* ¶¶ 8–9.) Fisher testified that he did serve as a foreman for Maxim and its various operators generally, but that he was not on the Old Hickory Bridge job site. (Docket No. 148 ¶ 29.)

Maxim and Aptus agree that Maxim chose the specific cranes and operators for the project, although they dispute who chose the *type* of crane that would be used. (Docket No. 134 ¶ 10.) The companies discussed the possibility of using a "spider-type crane," but Maxim did not have one available. (*Id.* ¶ 11.) They ultimately decided to use a Carrydeck-style crane with a suspended manbasket. Aptus, relying on the Snyder Affidavit, asserts that Maxim recommended the Carrydeck crane. Maxim disputes this characterization, pointing to testimony that, it argues, supports the conclusion that Snyder himself developed the plan to use a Carrydeck crane. (*Id.* ¶ 12.)

Representatives of Maxim and Aptus signed two "Short Term Daily/Weekly Service Agreements" to cover the work performed. (*Id.* ¶ 15; Docket No. 133-4.) Each Agreement consisted of a form on the front filled out by hand to provide basic details of the project for the week, with Terms and Conditions on the back. (Docket No. 133-4.) The front of the Agreement included the following notice:

> **THE TERMS AND CONDITIONS GOVERNING THIS AGREEMENT AS DESCRIBED ON THE FRONT AND BACK SIDES ARE UNDERSTOOD, AGREED TO AND ARE INCORPORATED BY REFERENCE. CUSTOMER IS PLACED ON NOTICE THAT THE TERMS AND**

**CONDITIONS ON THE REVERSE SIDE CONTAIN PROVISIONS THAT, AMONG OTHER THINGS, REQUIRE CUSTOMER TO INDEMNIFY OTHERS, INCLUDING MAXIM, FROM CUSTOMER'S AND MAXIM'S NEGLIGENCE; WAIVE ALL JURY TRIALS; AND ELIMINATE WARRANTIES.**

(Docket No. 133-4 at 2.)

Section 1 of the Terms and Conditions included the following language regarding the division of responsibilities between Maxim and Aptus:

> **Control, Supervision, and Operation of Equipment, Operators and/or Crew:** Customer agrees that the Equipment, and all persons operating or maintaining such Equipment, including Maxim's employees, agents or independent contractors, are under Customer's exclusive jurisdiction, possession, supervision, and control. Customer is responsible for providing a competent and experienced site supervisor and lift director to oversee job site and lifting operations . . . . Customer is responsible for providing overall job site safety. . . . Customer is responsible to ensure the Equipment shall be operated in a safe and lawful manner at all times, and in accordance with the manufacturer's operator's manual, OSHA, MSHA and ANSI Standards . . . . The operation of the Equipment shall not exceed the manufacturer's safety requirements and rated load capacities. . . . If Equipment is furnished with an operator, the services of such operator will be performed under the complete direction and control of Customer and operator shall be considered Customer's employee for all purposes other than the payment of wages, worker's compensation, and their benefits.

(*Id.* at 3.)

Section 4 included the following terms regarding indemnification:

> To the fullest extent allowed by applicable law, Customer shall defend, indemnify, and hold harmless Maxim, its officers, directors, shareholders, partners, members, managers, employees affiliates, representatives and agents ("Indemnitees") from any and all actions, causes of action, claims, suits, demands, investigations, obligations, judgments, losses, costs, liabilities, damages, fines, penalties and expenses, including attorney fees, which are incurred by, accrued, asserted, or made against, or recoverable from any of the Indemnitees arising from or relating to, directly or indirectly Customer's acceptance, possession, transport, use, operation, or control of the equipment, whether or not the same arises from damage to property (real or personal), injury or death to persons including but not limited to Customer's employees, agents and representatives, failure to comply with applicable laws, regulations, and ordinances, equipment condition or loss of use or seizure of equipment. Customer expressly agrees to waive any workers' compensation immunity it may otherwise have. The duty to defend, indemnify and hold harmless

4

Indemnitees exists whether or not the underlying claim or loss is based in whole or in part upon the active, passive or concurrent negligence of Indemnitees. Customer's obligation to defend, indemnify and hold harmless the Indemnitees shall survive the termination of this service agreement. It is expressly agreed that this indemnification clause applies to both third-party claims and all claims between Maxim and Customer. In jurisdictions in which the indemnification provided for in this section is broader than that allowed by applicable law, this section shall be interpreted as providing the broadest indemnification permitted and shall be limited only to the extent necessary to comply with said law.[1]

(*Id.*)

The Agreements were signed on Aptus's behalf by, respectively, Snyder and Aptus job superintendent Eric Ross. According to Snyder, Maxim never informed him or anyone in Aptus's senior management of the details of the Terms and Conditions. (Docket No. 114-1 ¶ 5.) Instead, the Agreements were presented to Snyder and Ross on a bridge deck, after dark, and characterized merely as authorizations to start work. (Docket No. 134 ¶ 18.) In Martin's testimony, he referred to the agreements as "job tickets." (Docket No. 148 ¶ 22.) Snyder and Ross both claim that they signed the Agreements in reliance on Maxim's representation that they were merely signing start work orders and that, if they had understood what the Agreements stated, they would not have signed them. (Docket No. 134 ¶¶ 20–21.) Aptus maintains that it never intended to enter into any agreement pursuant to which it would indemnify Maxim, take responsibility for Maxim's employees, or waive any immunity under the state's workers' compensation laws. (*Id.* ¶¶ 26–27.)

Aptus has provided an Affidavit by its Vice President of Human Resources, Thomas Edward Dill, stating that neither Ross nor Snyder had the authority to enter into the terms contained in the Terms and Conditions. According to Dill, only the Company's President, Scott Dill, had such authority. (*Id.* ¶ 22.) In their depositions, however, Snyder and Ross both conceded that they sometimes signed rental agreements on behalf of Aptus and those agreements sometimes contained

---

[1] This text appears in bold, underlined, and in all caps in the Terms and Conditions. The court has reproduced it with ordinary capitalization and formatting for ease of reading.

terms and conditions. (*Id.*) In his deposition, Thomas Edward Dill conceded that Aptus had no written policy regarding who had authority to enter into particular agreements and that Snyder did have authority to sign some rental agreements. (Docket No. 148 ¶ 21.)

## B. The Model 3330 ELB Crane and Trimboli's Injury

Both of the cranes that Maxim provided had retractable booms. One of the cranes, however, the Model 3330 ELB, had a four-section boom that calls for the manual placement of a pin at a certain point in the boom mechanism between the third and fourth sections. Aptus maintains that, without the pin placed, the crane was inherently at a risk of collapse. Maxim responds that the crane could be operated safely without the pin, as long as certain situations involving particular angles and weights were avoided. (Docket No. 134 ¶ 30; Docket No. 148 ¶ 2.) OSHA regulations, however, require that an "employer must comply with all manufacturer procedures applicable to the operational functions of equipment, including its use with attachments." 29 C.F.R. § 1926.1417(a). Maxim concedes that it never specifically warned Aptus about the manual pinning feature of the crane or any associated risks. (Docket No. 134 ¶ 30.)

Maxim national Vice President of Safety Troy Wagner testified that it is his understanding that, before a Maxim crane is sent out to a job, it is put through a "quick one-over" visual inspection, with the expectation that the crane's operator will perform a pre-shift inspection before the crane is operated. (d)(1). (Docket No. 138 ¶ 4.) According to OSHA regulations, an equipment operator

> must begin a visual inspection prior to each shift [during which] the equipment will be used . . . . The inspection must consist of observation for apparent deficiencies. Taking apart equipment components and booming down is not required as part of this inspection unless the results of the visual inspection or trial operation indicate that further investigation necessitating taking apart equipment components or booming down is needed. Determinations made in conducting the inspection must be reassessed in light of observations made during operation.

29 C.F.R. § 1926.1412(d)(1). If the visual inspection identifies a deficiency, "an immediate determination must be made by the competent person as to whether the deficiency constitutes a safety hazard" and, "[i]f the deficiency is determined to constitute a safety hazard, the equipment must be taken out of service until it has been corrected." 29 C.F.R. § 1926.1412(d)(2). The requirement that equipment posing a safety hazard be immediately removed from use is known as the "Tag-Out" requirement. (Docket No. 148 ¶ 30.) The operator who was assigned to the crane by Maxim, Brent Wiley, testified that the required beginning-of-shift inspection for a crane that required pin placement should include checking the pins. (*Id.* ¶ 3.)

When Wiley was assigned to operate the Model 3330 ELB crane, he had about nine years of experience as a crane operator and was certified by the National Commission for the Certification of Crane Operators ("NCCCO"), but he had never operated, been trained on, or read the manual for the Model 3330 ELB specifically. He also had never lifted a worker in a manbasket. Wiley did testify, however, that he had read Maxim's own Safety Manual, which states that "the operator is generally responsible for understanding the [crane's] functions and limitations as well as its particular operating characteristics which can be found in the crane's operating manual." The Safety Manual also explained that the manual for any particular crane would be physically available in the crane's cab. Despite the Safety Manual's admonition, Wiley did not read the manual for the Model 3330 ELB crane before beginning work on the Old Hickory Bridge project. (Docket No. 91-8 at 28; Docket No. 134 ¶¶ 31–35; Docket No. 138 ¶¶ 5–9, 16.) Maxim did not inform Aptus of any of the details of Wiley's experience or lack thereof. (Docket No. 134 ¶¶ 31–35.)

In 2014, Wiley had been terminated by Amquip, a predecessor company that eventually merged with Maxim, and paperwork associated with his termination indicated that he was "not

eligible for rehire" and had been "unable to perform [his] duties." Branch Manager Scott White testified, however, that the description of Wiley's termination in the paperwork had been in error and that he, in fact, had been let go because the company's work was slowing down and had remained eligible for rehire. (Docket No. 148 ¶ 35.)

Work on the Old Hickory Bridge project was to be performed overnight, and the first shift of crane operation occurred on the night of November 13–14, 2017. Wiley testified that, when operating the crane the first night, he noticed that the boom was not retracting properly, which he characterized in his testimony as posing a safety risk. Wiley noted the issue in the crane's daily inspection log. Wiley testified that he also called Fisher to inform him of the problem, although Fisher testified that he did not remember any such call. Fisher claims that, if Wiley had informed him of a problem with the crane's boom, Fisher would have informed Maxim's maintenance department. Phone records confirm that Fisher and Wiley were in frequent contact, including both around the end of Wiley's first shift and around the beginning of his next shift.(Docket No. 138 ¶ 15; Docket No. 148 ¶¶ 4, 43.)

Trimboli's position is that, once Wiley (and possibly Fisher) became aware of the boom problem, the crane should have been removed from operation pursuant to the Tag-Out requirement. In his deposition, Fisher was asked about Maxim's policies regarding compliance with the OSHA Tag-Out rules, but he appeared to be unfamiliar with the issue or with what either OSHA or Maxim required regarding Tag-Out. (Docket No. 148 ¶ 31.) Wiley used the crane again on his next shift, over the night of November 14–15. Trimboli was in the basket. According to Trimboli, around midnight, the basket suddenly and unexpectedly fell 15 to 20 feet before lurching to a halt. The force from the sudden arrest of the rapid fall shattered both of Trimboli's legs. (Docket No. 55 ¶¶ 34–36.) Wiley testified that he does not believe that the basket actually fell, because he was

watching a crane cable that would have moved in the event of a fall, and it did not move. He speculated that Trimboli could have injured himself by improperly getting outside the basket and then jumping back in. (Docket No. 97-2 at 112.)

Ross, however, has stated in an Affidavit that he was present at the time of the incident, had been looking at Trimboli in the basket shortly before he was injured, and Trimboli was safely tethered within the basket as designed. (Docket No. 114-4 ¶ 8.) According to Ross, numerous Aptus employees witnessed the incident, including Ross himself, Michael Terebo, Marquet Thames, and Brian Accetta, and that the basket did indeed drop. (*Id.* ¶ 9.) According to Ross, there was "no question" among those present that "something had happened with the crane, either some mechanical problem or an operator error, that had caused th[e] basket to fall and suddenly stop." According to Ross, no one present suggested that Trimboli had been outside the basket at the time or that the injury was caused by anything other than a sudden fall and arrest of the basket. (*Id.* ¶ 11.)

Aptus has provided the Affidavit of Dennis W. Eckstine, a mechanical engineer, detailing his analysis of the incident. (Docket Nos. 114-5 & -6.) Eckstein writes:

> It is my opinion to a reasonable degree of scientific and engineering certainty, that the crane boom did in fact collapse in this incident and dropped the basket. This was caused by Maxim's and Wiley's failure to properly pin the boom, and resulted in the basket or load dropping a substantial distance below its original position until it abruptly stopped below the level of the bridge deck. Numerous tests and simulations demonstrating this are contained in my report.

(Docket No. 114-5 ¶ 5.)

## C. Litigation and Discovery Disputes

On April 6, 2018, Trimboli filed his Complaint in this case—followed that same day by his first Amended Complaint—naming Maxim as the sole defendant. (Docket Nos. 1 & 5.) He asserted that Maxim was liable for his injuries based on both common law negligence and

negligence per se because of its failure to comply with OSHA regulations. (Docket No. 5 ¶¶ 13–16.) On June 6, 2018, Maxim filed its Answer and a Third-Party Complaint against Aptus. (Docket No. 11.) Maxim explained that it had demanded that Aptus indemnify and hold Maxim harmless but that Aptus had declined. Maxim therefore brought a claim for breach of contract, seeking indemnification. (*Id.* ¶¶ 15–18.) On July 15, 2018, Old Republic filed a Motion to Intervene, which the court granted. (Docket Nos. 24 & 30.) In its Intervenor Complaint, Old Republic explained that it had been Aptus's workers' compensation insurance provider at the time of the accident. As such, it might have subrogation rights against any recovery by Trimboli. (Docket No. 26 ¶¶ 6–7.)

Litigation proceeded, but, over the course of the ensuing months, the parties developed a number of disputes related to discovery, particularly regarding Maxim's alleged failures to disclose relevant information in a timely manner.

**1. Wiley Questionnaire.** The day after the accident, Wiley filled out an "employee questionnaire" detailing the underlying events. On the document, Wiley wrote that he "felt a shock in the cab from the man basket falling," which seems to contradict his later claims. (Docket No. 97-3 at 22.) According to Aptus, the Wiley questionnaire "was never produced by Maxim in its Initial Rule 26 Disclosures; does not appear in the materials provided by Maxim to Tennessee OSHA; and was never produced in response to written requests for production of documents propounded by either Trimboli or Aptus." (Docket No. 98 at 3–4.) At the time of Wiley's March 6, 2019 deposition, the document still had not been produced, and Wiley offered the alternate account discussed earlier in this Memorandum, in which Wiley claimed that his contemporaneous observation of the crane cable suggested that the manbasket did not fall. The questionnaire was finally produced on June 10, 2019, by email, on the ground that it and other documents were "just located" in the file of Maxim Regional Safety Director Cecil Elliott. (Docket No. 97-8 at 2.)

**2. Travis Powers & Darrell Wodzinski.** Aptus and Trimboli allege next that Maxim concealed the identity of a critical potential witness with first-hand information about the crane, Maxim senior mechanic and shop foreman Travis Powers, until well into litigation. Powers has stated that he examined the Model 3330 ELB crane the day after the accident, along with White and Elliott. Powers allegedly discovered that the boom pin had been missing from the crane and explained to White and Elliott that the missing pin had likely caused the boom to collapse, leading to Trimboli's injury. (Docket No. 97-11 at 27–32.) Maxim, however, did not list Powers as a potential witness in its mandatory Rule 26 disclosures. (Docket No. 93 ¶ 8.) White, moreover, testified in his deposition that he examined the crane alone, at which point he found the pin sitting in the cab, which, Aptus and Trimboli argue, concealed Powers' role in the inspection. (Docket No. 97-6 at 53–54.) Elliott also failed to disclose the meeting/inspection with Powers when he was deposed. (Docket No. 98 at 7.)

When Powers did finally testify, he stated that, shortly after the accident, White had told him that he believed that the manbasket had indeed dropped, seemingly contradicting the position Maxim would take in litigation and what Wiley would claim in his deposition. (Docket No. 97-11 at 13.) Powers testified that, when he told Elliott and White that the missing pin was the likely cause of the accident, they did not dispute his analysis and at least one of them responded, "Yeah, that makes sense." (*Id.* at 32–33, 63–64.) As with the Wiley questionnaire, Aptus and Trimboli allege that Powers, an important witness, was concealed from Tennessee OSHA. (Docket No. 98 at 6.) Powers confirms that he was not involved in the Tennessee OSHA review. (Docket No. 97-11 at 37.)

Although less of a focus in the parties' briefing, Aptus and Trimboli also take issue with Maxim's failure to earlier disclose another late-discovered witness, Maxim mechanic Darrell

Wodzinski. Wodzinski testified that he had been sent to examine the crane after the accident, and several Maxim mechanics discussed the possibility that the absence of the pin had caused the accident. (Docket No. 97-9 at 21–22, 26, 41–42, 63–66, 71–72.) Wodzinski, however, had never been identified as a potential witness until his name came up in the deposition of Maxim Parts and Service Manager Jimmy Winters. Wodzinski also was not identified as a material witness to Tennessee OSHA. (Docket No. 98 at 7.)

**3. Alteration of Crane Prior to Inspections.** According to the Initial Case Management Order, "[c]ounsel for Maxim advised that the condition of the equipment had not been changed since the accident and that no changes would be made pending further inspections." (Docket No. 34 at 4–5.) Aptus and Trimboli, however, argue that the condition of the crane was changed in the way most relevant to this case, by reinsertion of the pin that should have prevented the boom collapse, in an effort to conceal the cause of the accident.

Tennessee OSHA came to inspect the crane on November 16, 2017. The record contains photographs from that inspection, and Aptus characterizes those photographs as showing the crane with the pin in place, which Maxim disputes. (*See* Docket Nos. 155-3 & -4; Docket No. 156 at 4.) Based on the court's review of the photographs, as well as discussion of the pin in the crane's manual, it does appear to the court that the photographs more likely than not depict the pin as in place, although the images are somewhat grainy. Powers testified that, if the pin indeed had been in the boom at the time of the November inspection, that meant that it had been placed there after the accident and his own post-accident inspection of the crane. (Docket No. 85-1 at 79.). However, in email correspondence between Maxim and Tennessee OSHA after that inspection, a Maxim official represented to OSHA that Maxim's internal inspection had "found no issues" with the crane, which Aptus and Trimboli characterize as a misrepresentation. (Docket No. 97-4 at 171.)

Similarly, an internal "Maxim Crane Works Crane Accident Investigation Report" states that "no deficiencies were found" when Maxim inspected the crane post-accident. (*Id.* at 184.) The Report concludes that, "based on [Maxim's] investigation[,] it is believed that the man-basket was caught on the outside of the bridge structure." (*Id.*)

Experts for Trimboli and/or Aptus were allowed to examine the crane in May and November of 2018. Maxim concedes that, when the crane was inspected, the pin had been put in place. (Docket No. 93 ¶ 22.)

**4. False Statements Regarding Reinsertion of Pin for Inspection.** Maxim has filed Affidavits by Wagner and Elliott, in which each claims that the pin was not reinserted into the crane prior to the inspection by Tennessee OSHA. (Docket No. 108-1 ¶ 6; Docket No. 108-2 ¶ 5.) Also, Maxim Safety Director John Merrill testified that, at the time of that inspection, the crane was "configured exactly the way it was on the jobsite" (Docket No. 155-1 at 80.) Aptus and Trimboli argue that all of those statements were false, as evidenced by full-color, digital versions of the OSHA inspection photos they received on December 16, 2019 from Tennessee OSHA by way of a Public Records Act request. (Docket No. 155-2 ¶¶ 2–3.) Earlier versions of the photos supplied by Maxim were significantly less clear and, as a result, left more ambiguity regarding whether the pin had, in fact, been reinserted into the crane. Maxim's witnesses, Aptus argues, attempted to deceive Aptus, Trimboli, and the court, on the assumption that clearer versions of the photos would never surface.

**5. Alteration of Daily Crane Inspection Log.** Aptus and Trimboli also allege that Maxim modified the crane's inspection log. Specifically, a photograph taken after the accident apparently depicts the log as showing no post-trip inspection on November 13 and no pre-trip inspection on November 14. The version of the log eventually given to OSHA investigators and included in

Maxim's initial disclosures, however, included marks for both supposed inspections. (*Compare* Docket No. 97-3 at 16 (ex. 40) with Docket No. 97-4 at 188.) In his affidavit, Elliott claims that Wiley altered the form after the photograph was taken, but that the alteration was merely to accurately reflect the inspections that were performed but that had not yet been recorded. (Docket No. 108-1 ¶ 5.)

### D. Pending Motions[2]

On September 27, 2019, Trimboli filed a Motion for Partial Summary Judgment asking the court to rule that the cap on noneconomic damages imposed by the Tennessee Civil Justice Act of 2011 ("TCJA") does not apply to his claims because Maxim "intentionally falsified, destroyed or concealed records containing material evidence with the purpose of wrongfully evading liability in the case at issue." Tenn. Code Ann. § 29-39-102(h)(2). (Docket No. 82.) Three days later, he filed an Amended Motion for Summary Judgment raising the same issue. (Docket No. 87.)

On November 4, 2019, Aptus filed a Motion to Dismiss, asking the court to dismiss Maxim's claim against it based on Maxim's alleged concealment and spoliation of evidence. (Docket No. 97.) Specifically, Aptus alleged that Maxim

> spoiled post-accident evidence by failing to document or preserve the condition of the crane and its components, then altered the condition of Crane Unit 2222 by replacing the missing pin in the boom before the unit could be inspected by others, including consulting experts for plaintiff Trimboli and consulting experts for Aptus, during two (2) separate crane inspections[,]

and "failed to disclose various documents and the identities of critical fact witnesses in its Initial Rule 26 Disclosures, and in its responses to written discovery requests propounded by both Trimboli and Aptus." (*Id.* ¶¶ 4–5.)

---

[2] This discussion excludes pending motions in limine, which will be considered prior to trial.

On November 7, 2019, Trimboli filed a Motion for Rule 37 Sanctions against Maxim. (Docket No. 99.) Trimboli "incorporate[d] by reference" the discovery-related allegations that Aptus had made seeking dismissal. (*Id.* at 1.) Trimboli asked the court "to strike all Affirmative Defenses Asserted by Defendant Maxim as an appropriate sanction for Maxim's discovery abuses." (*Id.* at 3–4.)

On December 10, 2019, Aptus filed a Motion for Summary Judgment, arguing that, as a matter of law, it had no indemnification obligation to Maxim. (Docket No. 114.) Specifically, Aptus argued that the indemnification provisions of the Agreements were void and unenforceable or, in the alternative, there was a lack of mutual assent between the parties and/or Maxim fraudulently induced Aptus's agreement. Aptus also argued that the agreement violated the exclusive remedy provisions of the Tennessee Workers' Compensation Act. (Docket No. 115.)

On the same day, Trimboli filed a "Motion for Partial Summary Judgment on [the] Affirmative Defense of [the] Loaned Servant Doctrine." (Docket No. 118.) As his only argument in support of his motion, he cited and incorporated by reference parts of Aptus's briefing. (Docket No. 118.)

Finally, also on December 10, 2019 Maxim filed a Motion for Summary Judgment. (Docket No. 120.) Maxim both challenged the sufficiency of Trimboli's negligence allegations and argued that any claims were only appropriate against Aptus, because Aptus had exclusive supervision and control over the crane at the time of Trimboli's injury. (*Id.* at 1–2.)

On January 17, 2020, Aptus filed a "Supplemental in Support" of its pending Motion to Dismiss. (Docket No. 155.) The filing asserted additional facts regarding Maxim's allegedly improper behavior during discovery. (*Id.* at 1–2.) On January 21, 2020, Maxim filed a Motion to Strike, arguing that the court should strike and refuse to consider Aptus's supplemental filing.

(Docket No. 156.) On January 24, 2020, Aptus filed a "Motion to Accept and Consider" its supplemental filing of the previous week and reiterating its request for sanctions. (Docket No. 157.) On February 11, 2020, Maxim filed a motion requesting a hearing on the pending discovery-related issues. (Docket No. 159.)

## II. LEGAL STANDARD

### A. Summary Judgment

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is

"genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## B. Discovery Sanctions

"Because failures to produce relevant evidence fall along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality, the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault." *Adkins v. Wolever*, 554 F.3d 650, 652–53 (6th Cir. 2009) (internal quotation marks and citations omitted). Therefore, a proper sanction, which can range from dismissal of the case to an instruction that the jury "may infer a fact based on lost or destroyed evidence," will serve "both fairness and punitive functions." *Id.*

## III. ANALYSIS

### A. Maxim's Hearsay Objections

As a preliminary matter, Maxim has objected to various instances in which Aptus has relied on affidavits either in support of its own motion for summary judgment or in opposition to Maxim's motion. Maxim argues that the affidavits are inadmissible hearsay. Maxim's assumption that a bare hearsay objection is sufficient to render a fact outside the scope of consideration at the summary judgment stage is, however, mistaken.

Whether a fact can be considered in support of or opposition to a motion for summary judgment depends, not on the form in which it is presented at the time of the motion, but on whether the fact can be presented in admissible form at trial. *See Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c), advisory committee's note to 2010 amendment); *Mount Vernon Fire Ins. Co. v. Liem Constr., Inc.*, No. 3:16-CV-00689, 2017 WL 1489082, at *3

(M.D. Tenn. April 26, 2017) (Crenshaw, J.); *Wilson v. Stein Mart, Inc.*, No. 3:15-CV-01271, 2016 WL 4680008, at *2 (M.D. Tenn. Sept. 7, 2016) (Nixon, S.J.); Jeffrey W. Stempel et al., 11–56 Moore's Federal Practice—Civil § 56.91 (2018); *see also Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. After a 2010 revision to Rule 56, materials cited to support or dispute a fact need only be capable of being presented in a form that would be admissible in evidence." (citations and internal quotation marks omitted) ); *Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016) (noting that "Rule 56 was amended in 2010 to eliminate the unequivocal requirement that evidence submitted at summary judgment must be authenticated" and instead "requires that such evidence 'would be admissible in evidence' at trial" (quoting Fed. R. Civ. P. 56(c)(4) ); *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (noting that, if a fact is objected to on evidentiary grounds on a motion for summary judgment, "the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated" (emphasis added)).

Maxim's cursory allegations of hearsay do not include any argument that the relevant facts are incapable of being reduced to admissible form at trial, and the court is of the opinion that they would be admissible in some form. The court, therefore, will rely on the cited affidavits insofar as they are relevant to any issue before the court that is determinative of any relevant motion.

## B. Aptus's Indemnity of Maxim

Since 1976, Tennessee has had an Anti-Indemnity Statute regarding construction, which provides:

> A covenant[,] promise, agreement or understanding in or in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of a building, structure, appurtenance and appliance, including moving, demolition and excavating connected therewith, purporting to indemnify

or hold harmless the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, the promisee's agents or employees or indemnitee, is against public policy and is void and unenforceable.

Tenn. Code Ann. § 62-6-123. The Tennessee Court of Appeals has specifically held that the Anti-Indemnity Statute applies to a "corporation . . . in the business of owning cranes which it uses to furnish crane service to the general public including the construction industry." *Elliott Crane Serv., Inc. v. H.G. Hill Stores, Inc.*, 840 S.W.2d 376, 379 (Tenn. Ct. App. 1992); *see also Armoneit v. Elliott Crane Serv., Inc.*, 65 S.W.3d 623, 631 (Tenn. Ct. App. 2001).

Although Maxim does not concede that the Tennessee Court of Appeals interpretation is correct, it does not identify any textual basis for construing the Anti-Injunction statute *not* to apply to the Old Hickory Bridge project. The Anti-Indemnity Statute applies to all agreements "relative to the construction, alteration, repair or maintenance of a building, structure, appurtenance and appliance, including moving, demolition and excavating connected therewith." Tenn. Code Ann. § 62-6-123. The Old Hickory Bridge project involved the alteration of a structure—namely, the removal of the unused natural gas pipeline from the bridge—or, if one chooses to characterize it differently, the demolition of the pipeline. An equipment and services agreement related to such a project is well within the plain language of the statute.

Maxim argues next that, although the Anti-Indemnity Statute does forbid some aspects of the parties' indemnity provision, it does not conflict with every type of indemnity promised. Specifically, the statute only forbids indemnity for damages "caused by or resulting from the *sole negligence* of the promisee, the promisee's agents or employees or indemnitee." Tenn. Code Ann. § 62-6-123 (emphasis added). The Sixth Circuit has considered similar "sole negligence" language in Michigan's anti-indemnity statute and held that it limits the statute's indemnity bar to situations in which the indemnitee alone is negligent—in other words, where there is no contributory or

comparative fault by another party, including indemnitor. *See Burdo v. Ford Motor Co.*, 828 F.2d 380, 384 (6th Cir. 1987). Maxim concedes that the indemnity provision, as written, does purport to indemnify Maxim for damages caused by Maxim's sole negligence, which would run afoul of the statute. Maxim argues, however, that Aptus still has an indemnification obligation to the degree that Aptus or Trimboli is held to be comparatively at fault. *See* 3 Bruner & O'Connor Construction Law § 10:70 (discussing majority of courts' treatment of "sole negligence" provisions in anti-indemnity statutes, where comparative fault is alleged).

As Aptus points out, however, there is another statute that potentially closes off the argument that Aptus can be treated as comparatively negligent in this case. Under the "exclusive remedy provision" of Tennessee workers' compensation law, "the rights and remedies granted to an employee subject to this chapter, on account of personal injury or death by accident . . . shall exclude all other rights and remedies of the employee, the employee's representative, dependents or next of kin, at common law or otherwise, on account of the injury or death." Tenn. Code Ann. § 50-6-108(a). "Pursuant to this section, workers' compensation law provides the exclusive remedy for an employee who is injured during the course and scope of his employment, meaning the employee is precluded from seeking tort damages for the injury." *Valencia v. Freeland & Lemm Constr. Co.*, 108 S.W.3d 239, 242 (Tenn. 2003) (*citing Liberty Mut. Ins. Co. v. Stevenson*, 368 S.W.2d 760 (1963)). The Tennessee Supreme Court has held, based on that provision, that, when an employer is one of multiple parties at fault in an employee's injury—raising the issue of comparative fault— "the exclusive remedy provision prevents a court from assessing fault to the injured employee's employer as a matter of law." *Poole v. Lowe's Home Centers, LLC*, No. 3:14-CV-01884, 2016 WL 7180148, at *5 (M.D. Tenn. Dec. 9, 2016) (Crenshaw, J.) (citing *Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 148 (Tenn. 2007); *Snyder v. LTG Lufttechnische GmbH*, 955

S.W.2d 252, 256 (Tenn. 1997); *Ridings v. Ralph M. Parsons Co.*, 914 S.W.2d 79, 81 (Tenn. 1996); *see also Long v. Quad Power Prod., LLC*, No. E2013-02708-COA-R3CV, 2015 WL 1306872, at *10 (Tenn. Ct. App. Mar. 20, 2015)). For example, if an employee is injured by the negligence of both his employer and an outside vendor, negligence can be attributed only to the vendor. Accordingly, if the only two parties potentially at fault in Trimboli's injury were Maxim and Aptus, then Maxim would be the only party that, under Tennessee law, could have negligence attributed to it.

Maxim responds, first, that the exclusive remedy provision has an express exception for liability pursuant to indemnity: "This section shall not be construed to preclude third party indemnity actions against an employer who has expressly contracted to indemnify the third party." Tenn. Code Ann. § 50-6-108(c). That exception, though, is an exception to the general rule that an employee cannot sue his statutory employer outside of the workers' compensation setting, not the rule that the employer cannot have negligence attributed to it. For example, if a non-construction employer obtains services from a vendor and promises to indemnify the vendor for liability based on the vendor's own negligence, and the vendor's negligence injures one of the employer's employees, then the employee can sue the vendor for his injury, which was not caused by his statutory workers' compensation employer and therefore does not fall within the scope of 'exclusive remedy' immunity, and recover, ultimately, from his employer, who would likely be joined as a party, due to the indemnity provision—despite the fact that the employee could not sue the employer if the same injury had been caused by the employer's own negligence. The indemnity exception is necessary to prevent third parties from offloading their liability onto the statutorily immune employer, while still allowing indemnity provisions to be agreed upon where the parties so choose. But the very purpose of the Anti-Indemnity statute is to prevent one company, in the

construction setting, from transferring liability for its negligence onto another, *even if both parties wish to accept those terms*. The type of scenario that the indemnity exception to the exclusive remedy rule exists to preserve is not available to construction companies.[3]

Maxim argues next that the agreement between it and Aptus includes an express waiver of Aptus's workers' compensation immunity, which would revive Aptus's ability to be comparatively at fault. Aptus argues that that waiver should be disregarded because the contracts themselves are unenforceable, on the grounds that they were made without actual or implied authority, were procured by fraud, were unsupported by consideration, and/or did not represent a true meeting of the minds. The court will discuss this set of issues in more detail later in this opinion, when considering Maxim's motion for summary judgment. In short, however, each of these issues depends on the reasonable perceptions of the parties and the closely related question of ordinary practice in the construction industry, and the court cannot resolve any such issues at the summary judgment stage. Accordingly, while Aptus is correct that the Anti-Indemnity statute bars Maxim from seeking the degree of indemnity it seeks, there is still a possibility that indemnity might be permissible based on fault by Aptus and/or Trimboli, insofar as Aptus executed an enforceable agreement to waive its protection from liability under workers' compensation law.

Finally, Aptus argues that the court should not allow Maxim's breach of contract claim to survive based on the possibility of fault by Aptus or Trimboli, because the record does not contain evidence from which a reasonable juror could conclude that either Aptus or Trimboli was negligent. Whether Aptus was negligent, however, is inextricably related to the question of how

---

[3] Put another way, even if there is an indemnity exception to the exclusive remedy provision, that exception *presupposes* a valid indemnity obligation, which the Anti-Indemnity Statute forbids unless there is comparative fault—but comparative fault is only possible if one *presupposes* the existence of an exception to the exclusive remedy provision. Allowing each statutory provision to negate the other would be inescapably circular.

responsibilities were divided between Maxim and Aptus, which has been fiercely contested and remains unresolved. The court will not grant Aptus summary judgment, because a route remains for Maxim to prevail pursuant to a considerably circumscribed version of Aptus's indemnity obligation.

## C. Trimboli's Motion for Summary Judgment Regarding the Loaned Servant Doctrine

Trimboli has filed a "Motion for Summary Judgment on [the] Affirmative Defense of [the] Loaned Servant Doctrine." (Docket No. 118.) "Under the loaned servant doctrine," an employer can "'loan[]' an employee to a 'special employer,'" in which case the special employer may take the legal status of employer for certain discrete purposes. *Stephens v. Home Depot U.S.A., Inc.*, 529 S.W.3d 63, 75 (Tenn. Ct. App. 2016) (citing *Blackwell v. Comanche Const., Inc.*, No. W2012-01309-COA-R9CV, 2013 WL 1557599, at *8 (Tenn. Ct. App. Apr. 15, 2013); quoting Joseph H. King, Jr., *The Exclusiveness of an Employee's Workers' Compensation Remedy Against His Employer*, 55 Tenn. L. Rev. 405, 433 (1988)). Maxim argues that Wiley was loaned, as an employee, to Aptus, in which case Aptus, not Maxim, was responsible for any injuries he caused.

Trimboli's briefing on this matter, however, is insufficient to allow the court to consider the applicability of Maxim's defense for summary judgment purposes. In this district "*any motion for summary judgment* made pursuant to Fed. R. Civ. P. 56 must be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." L.R. 56.01(b). Moreover, "every motion that may require the resolution of an issue of law must be accompanied by a separately filed memorandum of law citing supporting authorities." L.R. 7.01(a)(2). Trimboli, however, has failed to satisfy either requirement. Instead, he merely cites to, and purportedly incorporates by reference, the facts alleged by and arguments made by Aptus. But the relevant Aptus briefing does not actually contain any meaningful

discussion of the loaned servant doctrine. To the contrary, the phrase "loaned servant" only appears twice, in reference to the procedural history of a case cited for other reasons. (Docket No. 115 at 16.) Trimboli's motion falls well short of the bare minimum requirements of a request for summary judgment on any issue, and his citation to tangentially related briefing by another party does nothing to remedy the motion's deficiencies. The motion will therefore be denied.

## D. Procedural Motions Regarding Alleged Discovery Abuse

Maxim has filed two procedural motions regarding the pending motions involving its alleged spoliation and concealment of evidence: a Motion to Strike Aptus's Supplemental Briefing (Docket No. 156) and a Motion for an Evidentiary Hearing (Docket No. 159). The court will deny both motions. With regard to its motion to strike, Maxim argues that Aptus did not seek leave to file supplemental briefing. That is true, but Aptus has since done so by filing a Motion to Accept and Consider Supplement to Motion to Dismiss and for Rule 37 Sanctions (Docket No. 157), which the court will grant with regard to the request to file supplemental briefing. With regard to Maxim's request for an evidentiary hearing, Maxim concedes that an evidentiary hearing is not required before imposing discovery sanctions (Docket No. 159 at 1), and it has not demonstrated a need for such a hearing here.

## E. Sanctions for Discovery Misconduct

Aptus and Trimboli have both sought sanctions against Maxim for its various alleged instances of misconduct during discovery, including its concealment of evidence and witnesses, its covert reinsertion of the pin into the crane before the crane could be inspected, and its presentation of false testimony attempting to cover up the reinsertion of the pin. They characterize Maxim's actions as spoliation and/or in violation of Rule 37 of the Federal Rules of Civil Procedure. Aptus requests that the court dismiss Maxim's third-party claim against it and/or

exclude some evidence that would be offered in support of Maxim's third-party claim. Aptus also seeks reasonable discretionary litigation costs, and its expert witness and attorneys' fees resulting from Maxim's alleged discovery violations. Trimboli asks that the court strike all of Maxim's affirmative defenses.

**1. Sanctions for Spoliation.** A federal district court has "broad discretion to craft proper sanctions for spoliated evidence." *Adkins*, 554 F.3d at 651. However, the party seeking sanctions for spoliation must show: (1) that the party having control over the evidence had an obligation to preserve the evidence at the time it was destroyed; (2) that the evidence was destroyed "with a culpable state of mind;" and (3) "that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (internal quotation marks omitted).

Maxim argues that, contrary to the allegations leveled by Aptus and Trimboli, it has not engaged in any spoliation of evidence, because it has not destroyed anything. Aptus and Trimboli, Maxim points out, have not identified any document or piece of equipment that existed at one time and no longer exists. Even the pre-alteration daily inspection log still exists in photographic form.

Aptus argues that Maxim engaged in spoliation by "destroying" the configuration of the crane at the time of the accident. That use of the term "destroying," however, stretches the word far beyond its use in typical spoliation cases. Moreover, the court notes that there are other, more directly on point grounds for imposing sanctions based on the alteration of the configuration of the crane, which the court will discuss in Section III.E.3 of this opinion. The court, therefore, will not impose sanctions under a spoliation theory.

**2. Sanctions Under Rule 37.** Rule 37 governs discovery disputes between parties. Rule 37(a) allows a party to file a motion to compel if the opposing party "fails to answer an interrogatory" or gives an "evasive or incomplete" answer. Fed. R. Civ .P. 37(a)(3) (B)(iii), (a)(4). Rule 37(b) allows a party to move for sanctions if the court has issued a discovery order and the opposing party has failed to comply. " 'Rule 37(b) usually has no application if there has not been a court order.' " *United States v. Reyes*, 307 F.3d 451, 457 (6th Cir. 2002) (quoting 8A Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2289 (2d ed.1994)). Rule 37(c)(1) allows a court to impose sanctions based on a party's failure "to provide information or identify a witness as required by Rule 26(a) or (e)," and Rule 37(c)(2) allows the court to impose sanctions based on a failure to admit a true fact. Finally, Rule 37(d) allows a party to move for sanctions without first moving to compel if the opposing party "fails to serve its [interrogatory] answers, objections, or written response." Fed. R. Civ .P. 37(d)(1)(A)(ii). The decision to order sanctions is within the court's discretion; "the court is to impose sanctions only if they are just and has discretion about the sanction to be imposed." 8A Wright & Miller, Federal Practice & Procedure § 2291 (3d ed.).

Aptus characterizes its argument regarding the placement of the pin in the crane as arising under Rule 37(b), meaning that the sanctions must be based on a failure to comply with a discovery-related order—in this instance, the court's Initial Case Management Order (Docket No. 34), which required that the crane be undisturbed pending inspection.[4] That argument, however, runs afoul of the fact that, by Aptus's own version of events, the pin was already reinserted prior to the entry of the Order. While one can argue that Maxim showed a lack of candor with regard to whether the configuration of the crane had been altered, the Order itself was not violated because

---

[4] The Order also recounted Maxim's representations to the court and the parties regarding its past handling of the crane, which the court will discuss later in this opinion. Because Rule 37(b) deals only with *violating* an order—as opposed to, for example, misrepresenting facts to the court in obtaining an order—this section will address only the Order's prospective obligations.

it did not impose any obligation on the parties until it was entered. Rule 37(b) alone, therefore, does not provide grounds for sanctioning Maxim with regard to the crane pin—although, as the court will discuss in the next subsection, that does not mean that Maxim complied with all of its obligations related to the formulation and entry of the order.

Aptus and Trimboli argue next that the court should sanction Maxim under Rule 37(c)(1) for its failure to identify Powers and Wodzinski earlier in the case and its failure to provide the incriminating Wiley statement earlier. Rule 37(c)(1) covers failures to disclose information required to be disclosed either by Rule 26(a)—governing initial, expert, and pretrial disclosures—or Rule 26(e)—governing the duty to supplement prior disclosures and discovery responses. Maxim argues that it was not required to disclose either man in its initial disclosures because it did not intend to rely on them as witnesses, causing them to fall outside the scope of required disclosures of persons under Rule 26(a)(1)(A). While Maxim is correct on that front, Aptus and Trimboli are correct that Maxim had, at the very least, a duty to disclose them under Rule 26(e), because Aptus sought, in its first set of interrogatories, the identities of anyone with knowledge of the condition of the crane at the time of the accident. Maxim did not identify either Powers or Wodzinski in its response, despite their roles in Maxim's internal post-accident investigation, giving rise to a duty to supplement under Rule 26(e). (Docket No. 157-1 at 6.)

Maxim argues that it identified Powers to counsel for all parties on August 8, 2019, by email, which Aptus and Trimboli do not dispute. (*See* Docket No. 84-2.) The request for sanctions, therefore, is premised not on a total failure to comply with Rule 26, but an alleged failure to provide requested information in a timely manner. Trimboli points out that Maxim employees with direct knowledge of Powers' involvement and knowledge were involved in this case long before his identity was disclosed, and it simply strains credulity to think that a fact as central to the case as

the details of the company's immediate post-accident investigation would simply go undiscovered and unmentioned for months upon months before the disclosure of Powers. The court agrees that it is implausible that Maxim was simply unaware of the potential importance of testimony by Powers until August of 2019. Moreover, any argument that Maxim's failure to identify Powers earlier was innocent is belied by the fact that White provided false deposition testimony concealing Powers' involvement and Maxim's other witnesses studiously avoided revealing Powers as a potentially relevant witness. Aptus and Trimboli, therefore, have identified some basis for discovery sanctions regarding the late identification of Powers.

Regarding Wodzinski, Maxim maintains that he was effectively disclosed in its Initial Disclosures, because his name appeared on a post-accident inspection form included in those disclosures. Although that fact does support an inference that Maxim was not affirmatively concealing Wodzinski's existence, Maxim has not identified any authority that would relieve it from specifically identifying him, too, with regard to the relevant interrogatory. There is, therefore, some basis for sanctions under Rule 37.

Finally, with regard to the Wiley statement, Maxim argues again that it did eventually provide the statement and that there is no evidence that any delay was improper. Maxim's argument that its late disclosure of the Wiley questionnaire was due to its not having been discovered earlier might be plausible if the statement had been found in some odd, unexpected place. But it was found in the files of Maxim's Regional Safety Director, an obviously relevant witness who should have been immediately expected to have had discoverable material. The court, therefore, also has authority to impose sanctions based on the delay in identifying the Wiley questionnaire.

**3. Inherent Authority.** Finally, Aptus and Trimboli argue that the court should sanction Maxim based on its inherent authority. "Federal courts have the inherent authority to sanction bad-faith conduct, as well as conduct that is 'tantamount to bad faith.'" *Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867, 872 (E.D. Mich. 2017) (quoting *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011)). This power is especially important in situations, such as this one, when the unique circumstances of a case present a scenario that does not fit neatly into the traditional categories of dispute contemplated by the Federal Rules. Maxim's post-accident handling of the pin and its representations to the court and the other parties about the condition of the crane may not fall directly within the Rule 37 categories or the spoliation caselaw, but it is undeniable that Maxim had an obligation of candor and good faith with regard to its approach to the matter. Therefore, if the court finds that Maxim's actions were improper, it can sanction the party based on the court's inherent authority.

Maxim argues that its representation to the court and the parties in the Initial Case Management Order that the "condition of the equipment had not been changed since the accident" (Docket No. 34 at 4–5) was truthful, because it does not consider the insertion of a pin that was designed to be removable and insertable with ease to be a change in the crane's "condition." The word "condition," used in this context, may be somewhat ambiguous. But Maxim, as the party in control of the crane, the party with knowledge of the crane's features, and the party making assurances to the court, had an obligation to express itself in a clear and non-misleading fashion, rather than relying on a hair-splitting distinction to conceal the truth. This misrepresentation is especially egregious in light of the fact that Maxim's senior mechanic Powers, Regional Safety Director Elliott, and Branch Manager White had all discussed the possibility that the missing pin caused the accident—a theory that all three, at the time, appear to have endorsed or at least

considered plausible. Moreover, Maxim compounded its error significantly by filing two false affidavits outright stating that the pin was not replaced before the OSHA inspection. (Docket No. 108-1 ¶ 6; Docket No. 108-2 ¶ 5.) The court, therefore, concludes that the court has the inherent authority to sanction Maxim for its handling of the issues surrounding the reinsertion of the pin.

**4. Nature of Sanctions.**  Maxim withheld the identity of an employee with highly relevant information far longer than it should have, and it misled the court and the other parties about its handling of physical evidence following the incident that gave rise to this cause of action. Moreover, it supported these actions with false deposition testimony and false claims in affidavits filed with the court. Maxim also allegedly deceived OSHA, but the court is wary of inserting itself into any conflict between Maxim and that agency. This is a tort action, not a Tennessee OSHA enforcement action, and Tennessee OSHA is not a party to this case. Even if the court were to wholly disregard Maxim's actions before OSHA, however, its behavior before the court has been outrageous.

Based on the above, the court will order Maxim to pay Aptus and Trimboli attorney's fees and costs related to (1) the taking of the depositions of Powers and Wodzinski; (2) the direct physical inspection of the crane, including hourly fees of experts, attorneys, and other personnel accumulated for the time of the physical inspection itself but excluding fees or costs related to pre-inspection preparation or the drafting of post-inspection reports; and (3) the litigation of the movants' underlying motions for sanctions (Docket Nos. 97, 99, & 157). Furthermore, Maxim is precluded from disputing that (1) the pin was missing from the crane at the time of the accident, (2) Maxim replaced the pin before OSHA's inspection, (3) Maxim represented to Aptus, Trimboli, and the court in July of 2018 that the "condition of the equipment had not been changed since the accident and that no changes would be made pending further inspections" (Docket No. 34 at 4–5),

(4) Maxim did not correct the court's written order memorializing Maxim's misleading statement, (5) Wagner and Elliott filed affidavits with the court that falsely stated that the pin was not replaced; (6) White falsely claimed to have inspected the crane alone, concealing Powers' involvement; and (7) Maxim did not inform Aptus and Trimboli about Powers until August 8, 2019. These latter six incidents of misconduct will be admissible at trial and will be particularly relevant regarding the application of Tennessee's statutory cap on economic damages, which the court will discuss in the next section.

## F. Damages Cap[5]

Tennessee tort law has long allowed a plaintiff to recover for various types of noneconomic damages, including "pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life—both past and future.'" *Elliott v. Cobb*, 320 S.W.3d 246, 248 n.1 (Tenn. 2010) (quoting *Overstreet v. Shoney's*, 4 S.W.3d 694, 715 (Tenn. Ct. App. 1999)). In 2011, however, the Tennessee General Assembly enacted a provision limiting noneconomic damages in a single action to $750,000 or, in certain select types of cases, $1,000,000. 2011 Tennessee Laws Pub. Ch. 510 § 10 (H.B. 2008), codified Tenn. Code Ann. § 29-39-102. Nevertheless, Tennessee reserved an exception to the new cap

> [i]f the defendant intentionally falsified, destroyed or concealed records containing material evidence with the purpose of wrongfully evading liability in the case at issue; provided, however, that this [exception] does not apply to the good faith withholding of records pursuant to privileges and other laws applicable to discovery, nor does it apply to the management of records in the normal course of business or in compliance with the defendant's document retention policy or state or federal regulations . . . .

Tenn. Code Ann. § 29-39-102(h)(2).

---

[5] As a preliminary matter, the court notes that Trimboli has filed both a Motion for Summary Judgment (Docket No. 82) and an Amended Motion for Summary Judgment (Docket No. 87) on this issue. The first of the two motions will be denied as superseded by the second.

Trimboli argues that the cap should not apply in this case because Maxim intentionally falsified, destroyed, or concealed material evidence. Based on the sanctions that the court is imposing, it cannot be reasonably disputed that Maxim did, at the very least, conceal material evidence with regard to the condition of the crane at the time of the accident and the potential testimony of Powers. To maintain the applicability of the cap, therefore, Maxim can only argue that its actions were not intentional. Maxim has advanced colorable arguments that its actions and delays were inadvertent, and, while the court finds those claims implausible, Maxim's version of events is not so wholly unworthy of credence that it can simply be dismissed out of hand. The court, accordingly, will deny Trimboli's Amended Motion for Summary Judgment regarding the damages cap.[6] Maxim will be permitted, at trial, to attempt to establish that it lacked the intent required in order for the damages cap to be lifted, although, as already explained, Maxim will not be permitted to dispute conduct that is otherwise sufficient to overcome the cap.

### G. Maxim's Motion for Summary Judgment

**1. Whether Wiley was Acting as a Maxim Employee.** Maxim argues, first, that it cannot be held liable for Wiley's actions on the day of the accident because, under the agreement between Maxim and Aptus, Wiley was working for Aptus, not Maxim, as a loaned employee. This issue is essentially the same as the one raised but inadequately briefed by Trimboli in one of his motions for summary judgment. Aptus and Trimboli respond that the agreements on which Maxim relies to characterize Wiley as an Aptus employee were fraudulently obtained and that the signatories had neither actual nor apparent authority to enter into contracts of that type. They also argue that,

---

[6] The court notes, however, that there are also unresolved issues that could cut in Trimboli's favor, because a jury might find further instances of concealment other than the actions covered in the court's discovery sanctions.

as a factual matter, Aptus never assumed control over Wiley or established a master-servant relationship with him, meaning that he remained an employee of Maxim only.

This issue is replete with disputed issues of fact that foreclose the possibility of summary judgment. For example, Aptus has produced testimony that neither Ross, Aptus's job superintendent, nor Snyder, Aptus's Vice President of Operations, had actual authority to enter into agreements of this type, and a reasonable jury could credit that testimony. In order to obtain summary judgment, then, Maxim would need to demonstrate, based on undisputed facts, that the men were acting on apparent authority. To make a showing of apparent authority, it must generally be shown that: "(1) the principal actually or negligently acquiesced in another party's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agency possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment." *Danny L. Davis Contractors, Inc. v. Hobbs*, 157 S.W.3d 414, 421–22 (Tenn. Ct. App. 2004) (quoting *Mechs. Laundry Serv. v. Auto Glass Co.*, 98 S.W.3d 151, 157 (Tenn. Ct. App. 2002) (citations and quotations omitted)). Additionally, it is well-established in Tennessee that apparent authority must be based on the acts of the principal rather than those of the agent. *Franklin Distrib. Co., Inc. v. Crush Int'l Inc.*, 726 S.W.2d 926, 930–31 (Tenn. Ct. App. 1986). "Apparent agency is essentially agency by estoppel; its creation and existence depend upon such conduct by the apparent principal as will preclude him from denying another's agency." *Davis*, 157 S.W.3d at 421.

As the Tennessee Supreme Court has explained, "[t]he liability of the principal is determined . . . by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by his acts under the circumstances conferred upon his agent." *Southern Ry. Co. v. Pickle*, 197 S.W. 675, 677 (Tenn. 1917)); *cf.* Restatement (Second) of

Agency § 166 cmt. b ("If ... the third person has reason to believe that the agent is acting for his own benefit, he cannot subject the principal to liability upon a contract which in fact is unauthorized."). The court cannot conclude that anything Aptus did gave rise to a reasonable reliance on the perceived authority of Ross or Snyder without evidence regarding ordinary practice in the construction field. Even with such evidence, reasonable jurors might reach different conclusions. The issue of authority to enter into the contracts is therefore not one that can be resolved on summary judgment.

Similar unresolved issues of fact preclude summary judgment on the issue of whether the contracts represented an enforceable meeting of the minds between Maxim and Aptus. "It is well-settled under Tennessee law that a contract must result from a meeting of the minds of the parties in mutual assent to the terms." *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 383 (6th Cir. 2005) (citing *Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Local No. 3-677*, 811 S.W.2d 875, 879 (Tenn. 1991). "Although the question of mutual assent involves largely an objective analysis, the parties' intent remains relevant, in particular the circumstances surrounding the formation of the contract." *Id.* (additional citations omitted). Tennessee courts have generally said that parties who do not read the contracts they sign cannot be heard to complain about the contracts' contents; they may not deny their obligations under those contracts and will be presumed by the court to know their contents. *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 359 (Tenn. Ct. App. 2001). Despite this general rule, however, courts have, at times, refused to hold parties to contracts that they have not read. *See Howell v. NHC Healthcare–Fort Sanders, Inc.*, 109 S.W.3d 731, 735 (Tenn. Ct. App. 2003) (holding that plaintiff was not bound by arbitration agreement that nursing home employee "pushed" in front of him without explanation that he was waiving a right to a jury trial if a claim was brought against the nursing home). If a jury were to credit Aptus's

account that this was an unusual contract, sprung on its employees in an unusual and deceptive way, the jury could find a lack of a meeting of the minds.

Moreover, even if one conceded the general validity of the contracts, there are outstanding issues of fact regarding whether Wiley was actually a loaned servant. Maxim relies on *Parker v. Vanderbilt University*, 767 S.W.2d 412 (Tenn. Ct. App. 1988), to argue that, although "whether a servant of one employer has become the servant of another is a question of fact," it is transformed into an issue of law when the two potential employers' relationship is governed by an "unambiguous written agreement." *Id.* at 417. However, even if that decades-old Court of Appeals case is an accurate statement of what the Tennessee Supreme Court would hold today, its reasoning is inapplicable here because of the presence of the Anti-Indemnity Statute. Although the contract does appear to give Aptus responsibility for the work done at the jobsite, Aptus may still be able to establish that, in the context of the parties' relationship and ordinary practices in the construction industry, Maxim, as a factual matter, exercised actual supervision and control of the relevant employees. Maxim would argue that those facts do not matter under *Parker*, because a loaned employee can be established entirely by the agreement on paper between the parties, regardless of facts or ordinary practices. That might be true, if the Anti-Indemnity Statute did not exist to block precisely that type of agreement. If Maxim actually retained control of Wiley and the contract was a mere formality, then the contract would be nothing but an indemnity provision under another name and would be unenforceable. The court, therefore, will not grant Maxim summary judgment on this basis. The issue of who was Wiley's employer is a question of fact that remains disputed.

**2. Negligent Hiring, Supervision, Training, or Retention.** Maxim argues that it is entitled to summary judgment with regard to Trimboli's theory that it engaged in negligent hiring, supervision, training, or retention of Wiley or other Maxim employees. To state a negligence claim

under Tennessee law, the plaintiff must state facts that, if true, would establish "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause." *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005). To prove a claim of negligent hiring or supervision under Tennessee law, a defendant must establish, "in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness for the job." *Doe v. Catholic Bishop of Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008). Maxim argues that the same standards should govern Trimboli's arguments regarding supervision and training. Maxim argues that its management had no knowledge that Wiley, an experienced and certified crane operator, was in any way unfit to operate the 3330 ELB crane.

In his Response, Trimboli stresses that the theory of negligence that he is advancing does not hinge solely on allegations that Wiley was negligently hired, retained, supervised, or trained. "Under the doctrine of respondeat superior, an employer may be held vicariously liable for torts committed by its employee within the course and scope of his or her employment." *Heflin v. Iberiabank Corp.*, 571 S.W.3d 727, 735 (Tenn. Ct. App. 2018) (citing *Washington v. 822 Corp.*, 43 S.W.3d 491, 494 (Tenn. Ct. App. 2000)). Trimboli has identified several acts by Maxim employees that could give rise to liability for Maxim, including Wiley's failure to read the crane's manual, his operation of the crane without the pin, his continued operation of the crane after it experienced problems retracting the boom, and Wes Fisher's alleged failure to take the crane out of use after Wiley informed him of the problem.

With regard to negligent training and supervision specifically, Trimboli points out that the evidence suggests that Fisher was never trained with regard to the company's own OSHA-imposed

Tag-Out responsibilities. Trimboli also points out that neither Fisher nor Wiley received any training regarding the Model 3330 ELB crane. Maxim's response to those allegations is that its employees knew of their obligation to read equipment manuals as well as Maxim's own safety manual. Maxim has not identified any ground for holding, however, that the availability of adequate manuals is an absolute defense to an allegation of negligent training. Finally, with regard to Wiley's fitness as a hire, there is some evidence that Maxim's own predecessor company had determined that he was unfit to rehire, although Maxim argues that this classification was in error. A reasonable juror, however, could find Maxim's self-serving claim that its own records misrepresented Wiley's fitness is implausible or that Maxim failed to ensure that its employees were adequately trained with regard to the operation of novel crane types. The court therefore will not grant summary judgment on the issue of Maxim's negligence related to hiring, supervision, or training.

**3. Punitive Damages.** "To be entitled to an award of punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant 'acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly.'" *Sanford v. Waugh & Co.*, 328 S.W.3d 836, 848 (Tenn. 2010) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn.1992)). Trimboli argues that he is entitled to punitive damages because Maxim acted recklessly. "A person acts recklessly so as to support an award of punitive damages when the person is aware of, but consciously disregards, substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Lane v. Becker*, 334 S.W.3d 756, 764 (Tenn. Ct. App. 2010) (citing *Hodges*, 833 S.W.2d at 901).

The court cannot preclude the possibility that a reasonable juror would conclude that Maxim acted recklessly in this case—for example, with regard to continuing to operate the crane after it experienced problems with the boom. The court, therefore, will not grant Maxim summary judgment with regard to its potential liability for punitive damages.

## IV. CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part the Motion to Accept and Consider and for Rule 37 Sanctions (Docket No. 157) and the Motion to Dismiss and For Rule 37 Sanctions (Docket No. 97) filed by Aptus Group USA, LLC ("Aptus"), as well as Jonathan Trimboli's Motion for Rule 37 Sanctions (Docket No. 99). The following motions will be denied: Trimboli's Motion for Partial Summary Judgment (Docket No. 82); Trimboli's Amended Motion for Summary Judgment (Docket No. 87); Aptus's Motion for Summary Judgment (Docket No. 114); Trimboli's Motion for Partial Summary Judgment on Affirmative Defense of Loaned Servant Doctrine (Docket No. 118); the Motion for Summary Judgment filed by Maxim Crane Works, L.P. ("Maxim") (Docket No. 120); Maxim's Motion to Strike (Docket No. 156); and Maxim's Motion for Hearing (Docket No. 159).

The court will order Maxim to pay attorney's fees and costs related (1) the taking of the depositions of Powers and Wodzinski; (2) the direct physical inspection of the crane, including hourly fees of experts, attorneys, and other personnel accumulated for the time of the physical inspection itself but excluding fees or costs related to pre-inspection preparation or the drafting of post-inspection reports; and (3) the litigation of the movants' underlying motions for sanctions (Docket Nos. 97, 99, & 157). Furthermore, Maxim is precluded from disputing that (1) the pin was missing from the crane at the time of the accident, (2) Maxim replaced the pin before OSHA's inspection, (3) Maxim represented to Aptus, Trimboli, and the court in July of 2018 that the

"condition of the equipment had not been changed since the accident and that no changes would be made pending further inspections" (Docket No. 34 at 4), (4) Maxim did not correct the court's written order memorializing Maxim's misleading statement, (5) Wagner and Elliott filed affidavits with the court that falsely stated that the pin was not replaced; (6) White falsely claimed to have inspected the crane alone, concealing Powers' involvement; and (7) Maxim did not inform Aptus and Trimboli about Powers until August 8, 2019.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge