UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JONATHAN TRIMBOLI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| OLD REPUBLIC INSURANCE CO., | ) |
| | ) |
| Intervening Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:18-cv-00346 |
| | ) Judge Aleta A. Trauger |
| MAXIM CRANE WORKS, L.P., | ) |
| | ) |
| Defendant, Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| APTUS GROUP USA, LLC | ) |
| | ) |
| Third-Party Defendant | ) |

## MEMORANDUM

Aptus Group USA, LLC ("Aptus") and Jonathan Trimboli have filed respective Notices of Attorney's Fees and Other Costs (Docket Nos. 164–65), to which Maxim Crane Works, L.P. ("Maxim") has filed Objections (Docket No. 167), and Aptus and Trimboli have filed Responses to the Objections (Docket Nos. 168–69). Maxim has filed a motion that it refers to as a Motion to Alter Judgment (Docket No. 170), to which Aptus and Trimboli have filed Responses (Docket Nos. 173–74), and Maxim has filed a Reply (Docket No. 175). For the reasons set out herein, Maxim's motion will be granted in part and denied in part, and Maxim will be ordered to pay attorney's fees.

# I. BACKGROUND

The details of this case are set forth in the court's Memorandum of March 3, 2020. (Docket No. 161.) In short, Aptus is a bridge utility construction and demolition company, and Maxim is a company that provides cranes and crane-related operations. Aptus contracted with Maxim to provide cranes and operations for a project removing an out-of-use natural gas pipeline from the Old Hickory Bridge. One night, around midnight, Trimboli—an Aptus employee—was in the basket of a crane when the basket suddenly and unexpectedly fell 15 to 20 feet before lurching to a halt, shattering Trimboli's legs. One possible explanation for the accident is that the crane was being improperly operated with a pin removed. There is also evidence that the crane had previously malfunctioned but was not taken out of use. Trimboli sued Maxim in this court, and Maxim filed a third-party claim for contractual indemnification against Aptus. Old Republic, as Aptus's workers' compensation insurance carrier, intervened to enforce any subrogation rights it might have against any recovery by Trimboli.

Over the course of the ensuing months, the parties developed a number of disputes related to discovery, particularly regarding Maxim's alleged failures to disclose relevant information in a timely manner. Although Trimboli and Aptus raised a number of issues, a few were particularly salient. First, Trimboli and Aptus alleged that Maxim had concealed the existence of two key Maxim employee witnesses, Travis Powers and Darrell Wodzinski, and a Maxim executive, Scott White, had offered allegedly false deposition testimony concealing the fact that Powers had been involved in the inspection of the crane the day after the accident. Second, Maxim allegedly misled the parties and the court about whether it had altered the configuration of the crane since the incident, particularly regarding the reinsertion of the pin, which had not been inserted when Trimboli was injured. According to the Initial Case Management Order, "[c]ounsel for Maxim advised that the condition of the equipment had not been changed since the accident and that no

changes would be made pending further inspections." (Docket No. 34 at 4–5.) In reality, the pin had been reinserted, which, among other things, may have concealed a potential cause of the accident from TOSHA when that agency inspected the crane. (*See* Docket Nos. 155-3 & -4; Docket No. 156 at 4.) Aptus and Trimboli also identified affidavits and testimony by Maxim personnel that discussed the configuration of the crane at the time of the TOSHA inspection in false or misleading ways. Two affidavits, in particular, by Troy Wagner and Cecil Elliott, contained outright false statements regarding whether the pin had been reinserted.

On September 27, 2019, Trimboli filed a Motion for Partial Summary Judgment, asking the court to rule that the cap on noneconomic damages imposed by the Tennessee Civil Justice Act of 2011 ("TCJA") does not apply to his claims because Maxim "intentionally falsified, destroyed or concealed records containing material evidence with the purpose of wrongfully evading liability in the case at issue." Tenn. Code Ann. § 29-39-102(h)(2). (Docket No. 82.) Three days later, he filed an Amended Motion for Summary Judgment raising the same issue. (Docket No. 87.)

On November 4, 2019, Aptus filed a Motion to Dismiss, asking the court to dismiss Maxim's claim against it based on Maxim's alleged concealment and spoliation of evidence. (Docket No. 97.) On November 7, 2019, Trimboli filed a Motion for Rule 37 Sanctions against Maxim. (Docket No. 99.) Trimboli "incorporate[d] by reference" the discovery-related allegations that Aptus had made seeking dismissal. (*Id.* at 1.) Trimboli asked the court "to strike all Affirmative Defenses Asserted by Defendant Maxim as an appropriate sanction for Maxim's discovery abuses." (*Id.* at 3–4.)

On December 10, 2019, Aptus filed a Motion for Summary Judgment, arguing that, as a matter of law, it had no indemnification obligation to Maxim. (Docket No. 114.) On the same day, Trimboli filed a "Motion for Partial Summary Judgment on [the] Affirmative Defense of [the] Loaned Servant Doctrine." (Docket No. 118.) Finally, and also on December 10, 2019, Maxim

3

filed a Motion for Summary Judgment. (Docket No. 120.) Maxim both challenged the sufficiency of Trimboli's negligence allegations and argued that any claims were only appropriate against Aptus, because Aptus had exclusive supervision and control over the crane at the time of Trimboli's injury. (*Id.* at 1–2.)

On January 17, 2020, Aptus filed a "Supplemental in Support" of its pending Motion to Dismiss. (Docket No. 155.) The filing asserted additional facts regarding Maxim's allegedly improper behavior during discovery. (*Id.* at 1–2.) On January 21, 2020, Maxim filed a Motion to Strike, arguing that the court should strike and refuse to consider Aptus's supplemental filing. (Docket No. 156.) On January 24, 2020, Aptus filed a "Motion to Accept and Consider" its supplemental filing. (Docket No. 157.)

On March 3, 2020, the court entered a Memorandum and Order addressing the various pending motions. (Docket Nos. 161–62.) The court held, first, that, although the indemnity provision between Maxim and Aptus was broader than could be enforced under Tennessee law, contested issues of fact prevented the court from granting Aptus summary judgment regarding whether the provision might apply to this case's facts. (Docket No. 161 at 22.) The court held next that Trimboli was not entitled to summary judgment regarding the potential availability of a "loaned servant" defense to Maxim. (*Id.* at 24.)

The court then turned to Maxim's various alleged discovery violations. The court concluded first that Maxim's failure to disclose the existence of Powers and Wodzinski earlier, as well as its delay in producing an internal questionnaire about the incident, represented violations of its duties, under Rule 37(c)(1) of the Federal Rules of Civil Procedure, to timely supplement its discovery responses. (*Id.* at 27.) The court concluded, next, that Maxim had violated its duty of candor to the court with regard to its representations regarding the "condition" of the crane and its filing of affidavits falsely stating that the pin had not been reinserted prior to the TOSHA

4

inspection. (*Id.* at 30.) The court did not conclude that any of the other alleged discovery violations raised by Aptus and Trimboli warranted sanctions.

The court therefore considered what sanctions, if any, were appropriate for Maxim's untimely identification of relevant witnesses and documents and its misrepresentations and omissions regarding the crane pin. The court wrote that Maxim's behavior more than justified the imposition of sanctions:

> Maxim withheld the identity of an employee with highly relevant information far longer than it should have, and it misled the court and the other parties about its handling of physical evidence following the incident that gave rise to this cause of action. Moreover, it supported these actions with false deposition testimony and false claims in affidavits filed with the court. Maxim also allegedly deceived OSHA, but the court is wary of inserting itself into any conflict between Maxim and that agency. This is a tort action, not a Tennessee OSHA enforcement action, and Tennessee OSHA is not a party to this case. Even if the court were to wholly disregard Maxim's actions before OSHA, however, its behavior before the court has been outrageous.

(*Id.* at 30.)

First, the court ordered Maxim to pay Aptus's and Trimboli's attorney's fees and costs "related to (1) the taking of the depositions of Powers and Wodzinski; (2) the direct physical inspection of the crane, including hourly fees of experts, attorneys, and other personnel accumulated for the time of the physical inspection itself but excluding fees or costs related to preinspection preparation or the drafting of post-inspection reports; and (3) the litigation of the movants' underlying motions for sanctions." (*Id.*) The court concluded, however, that attorney's fees and costs alone were inadequate to sanction Maxim's conduct. The court held, therefore, that Maxim will be precluded, at trial, from disputing that "(1) the pin was missing from the crane at the time of the accident, (2) Maxim replaced the pin before OSHA's inspection, (3) Maxim represented to Aptus, Trimboli, and the court in July of 2018 that the 'condition of the equipment had not been changed since the accident and that no changes would be made pending further

5

inspections'; (4) Maxim did not correct the court's written order memorializing Maxim's misleading statement; (5) Wagner and Elliott filed affidavits with the court that falsely stated that the pin was not replaced; (6) White falsely claimed to have inspected the crane alone, concealing Powers' involvement; and (7) Maxim did not inform Aptus and Trimboli about Powers until August 8, 2019." (*Id.* at 30–31.)

The court noted that many of those facts subject to the court's adverse inference are particularly relevant to damages in this case because the TCJA will likely cap Trimboli's potential noneconomic damages unless Maxim "intentionally falsified, destroyed or concealed records containing material evidence with the purpose of wrongfully evading liability in the case at issue." Tenn. Code Ann. § 29-39-102(h)(2). The court, however, denied the request by Trimboli for the court to grant summary judgment on that issue. The court acknowledged that, "based on the sanctions that the court is imposing, it cannot be reasonably disputed that Maxim did, at the very least, conceal material evidence with regard to the condition of the crane at the time of the accident and the potential testimony of Powers." (*Id.* at 32.) The court noted, however, that its sanctions left open the possibility of Maxim's establishing that "its actions were not intentional." (*Id.*) Accordingly, the court explained, "Maxim will be permitted, at trial, to attempt to establish that it lacked the intent required in order for the damages cap to be lifted." (*Id.*)

Finally, the court denied Maxim's request for summary judgment on a number of issues. With regard to the issue of punitive damages, the court wrote that it could not "preclude the possibility that a reasonable juror would conclude that Maxim acted recklessly in this case—for example, with regard to continuing to operate the crane after it experienced problems with the boom." (*Id.* at 38.)

On March 30, 2020, Maxim filed what it styled a Motion to Alter or Amend pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. (Docket No. 170.) Rule 59(e), by its own

6

language, governs "motion[s] to alter or amend a judgment," and no judgment has been entered in this case. A motion characterized as arising under Rule 59(e) but filed before the entry of a judgment, however, can be construed as a request for the court to reconsider an interlocutory ruling. *See, e.g.*, *Hestle v. United States*, No. Civ. 05-40245, 2005 WL 1981301, at *1 (E.D. Mich. Aug. 16, 2005) (construing purported Rule 59(e) motion as motion to reconsider). The court will do so here.

In its motion, Maxim raises the following grounds for reconsideration:

1. Maxim has construed the court's order "to prohibit its witnesses from defending their prior testimony or statements," which Maxim argues will "result in manifest injustice." Maxim identifies two ways it wishes to defend its statements: first, "witnesses Troy Wagner and Cecil Elliot should be permitted to offer testimony disputing that they 'falsely stated' in their affidavits that the pin was not in the crane during the TOSHA inspection, as both witnesses sincerely believed the pin was not in the crane at the time of the inspection and at the time they submitted the affidavits"; and, second, "Scott White should be able to offer testimony disputing that his deposition testimony was false regarding the post-accident inspection of the crane or that he intentionally concealed the participation of Travis Powers."

2. Maxim contends that its counsel "did not make a 'misleading statement' to the [c]ourt or the parties as supposedly represented in the Initial Case Management Order about the condition of the crane," because Maxim did not draft the proposed order, but, rather, had offered a different proposed order that did not contain the relevant language, which the court did not adopt;

3. Maxim argues that the court made a clear error of law by holding that a reasonable jury could impose punitive damages in this case.

7

(Docket No. 170 at 1–2.) Aptus and Trimboli oppose the Motion to Reconsider (Docket Nos. 173–74.)

## II. LEGAL STANDARD

While the Federal Rules of Civil Procedure fail to explicitly address motions to reconsider interlocutory orders, "[d]istrict courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991)); *see also In re Life Investors Ins. Co. of Am.*, 589 F.3d 319, 326 n.6 (6th Cir. 2009) ("[A] district court may always reconsider and revise its interlocutory orders while it retains jurisdiction over the case.") (citing *Rodriguez*, 89 F. App'x at 959; *Mallory*, 922 F.2d at 1282). Thus, district courts may "afford such relief from interlocutory orders as justice requires." *Rodriguez*, 89 F. App'x at 959 (quoting *Citibank N.A. v. FDIC*, 857 F. Supp. 976, 981 (D.D.C.1994)) (internal brackets omitted). Courts traditionally will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct clear error or prevent manifest injustice. *Louisville/Jefferson Cty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (citing *Rodriguez*, 89 F. App'x at 959). This standard "vests significant discretion in district courts." *Rodriguez*, 89 F. App'x at 959 n.7.

## III. ANALYSIS

### A. Scope of Sanctions

"Because failures to produce relevant evidence fall along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality[—]the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault." *Adkins v. Wolever*, 554 F.3d 650, 652–53 (6th Cir. 2009) (internal quotation marks and citations omitted).

Sanctions serve "both fairness and punitive functions" and may be as severe as the court's outright "granting summary judgment" to the wronged party. *Id.* The court can also take lesser steps such as instructing the jury that it "may infer a fact based on lost or destroyed evidence." *Id.* As the court explained in its previous Memorandum, it finds Maxim's behavior in this litigation to have been outrageous by any reasonable standard. Accordingly, the court crafted sanctions that were designed both to compensate the other parties for the costs Maxim imposed on them and to punish Maxim for straying far beyond the acceptable bounds of conduct that every litigant is expected to honor in this court.

To that end, many of Maxim's arguments regarding the supposed unfairness or manifest injustice of the sanctions against it miss the point. Maxim argues that the adverse inferences that the court has imposed will make it harder for Maxim to argue certain points it wishes to contest, but that is what the sanctions were supposed to do. It would hardly serve a punitive purpose to impose an 'adverse' inference or presumption that would *not* harm Maxim's defense. The court, moreover, chose these sanctions as an alternative to significantly harsher options, such as preventing Maxim from asserting the damages cap altogether or even awarding summary judgment. As the court's Memorandum acknowledged, Maxim still has seemingly viable avenues through which it can defend itself from liability and limit is liability if any is imposed. If the court's only options had been merely imposing fees and costs and doing nothing else or, in the alternative, doing something much harsher than it ended up doing, Maxim may well not have liked the results. Nevertheless, Maxim has identified some aspects of the court's sanctions that, at the very least, may call for clarification.

### 1.Maxim's Ability to Contest Knowledge/State of Mind

Maxim's first complaint about the sanctions against it mostly involves its desire to be able to put on evidence that, when its witnesses made statements that were false or arguably false, they

9

did not know they were doing so or they did not intent to mislead. The court, however, never meant to suggest otherwise, and the court takes responsibility for any lack of clarity in its Order. For example, the court held that Maxim cannot contest that Wagner and Elliott made false statements in their affidavits regarding the placement of the pin. Contrary to Maxim's objection, however, the mere now-uncontestable fact that those statements were false does not preclude Maxim from attempting to establish that the false statements were the result of inadvertence, misunderstanding, or mistake. How Maxim wishes to make such an argument, without at least partially waiving privilege and work product protection related to the preparation of the affidavits, might turn out to be difficult, but the court and the parties can deal with that issue when it arises. For now, the court will revise its Order to clarify that the fact of the witnesses' state of mind remains contestable.

The issue of Scott White's testimony regarding Powers is slightly more complicated, because Maxim does wish to argue, in a sense, that what White said was not "false." Specifically, Maxim wishes to argue that, because White may have been referring to another time he inspected the crane, it may have been true that Powers was not there. Having reread the relevant portion of White's testimony, the court finds that argument implausible. Nevertheless, the court will not prevent Maxim from making it. The underlying issue is, again, fundamentally one of state of mind—Maxim wishes to argue that, even if the testimony may seem misleading, White did not intend to mislead, because he was just thinking of a different incident. The court will, therefore, clarify its Order in this respect as well. Maxim cannot dispute that White testified that he inspected the crane alone, and it cannot dispute that he never, in his deposition, mentioned inspecting it with Powers or Powers finding the pin, but, if Maxim wishes to argue that White did not mean to misstate or misrepresent the facts, it can do so.

2. Maxim's Misrepresentation to the Court Regarding the Crane

10

Maxim's argument that it should not be treated as having misrepresented anything to the court because it did not draft the Initial Case Management Order reflects a misunderstanding of why it is being sanctioned. Maxim is not being sanctioned for the contents of the Order, but rather the misrepresentation *described* in the Order and Maxim's failure to take any steps to correct the Order. Insofar as the Order misstated what Maxim had represented at the parties' initial case management conference, Maxim had ample opportunity to clarify its position and seek an amendment to the Order, but it did not. In the view of the court, it is an appropriate sanction to preclude Maxim from resorting to that argument now. The court will revise the language of this sanction in an attempt to remove ambiguity, but the sanction will otherwise stand.

### B. Punitive Damages

The TCJA places a number of limitations on the availability of punitive damages for covered causes of action under Tennessee law. Among those limitations is the requirement that

> punitive damages may be awarded against a defendant based on vicarious liability for the acts or omissions of an agent or employee only if the finder of fact determines by special verdict based on clear and convincing evidence that one or more of the following has occurred:
>
> > (A) The act or omission was committed by a person employed in a management capacity while that person was acting within the scope of employment;
> >
> > (B) The defendant was reckless in hiring, retaining, supervising or training the agent or employee and that recklessness was the proximate cause of the act or omission that caused the loss or injury; or
> >
> > (C) The defendant authorized, ratified or approved the act or omission with knowledge or conscious or reckless disregard that the act or omission may result in the loss or injury.

Tenn. Code Ann. § 29-39-104(g)(1). Maxim argues that the court should have concluded that that provision precludes an award of punitive damages in this case. Trimboli argues that the court correctly denied Maxim summary judgment on punitive damages because (1) a reasonable jury

11

could conclude that at least one of the allegedly negligent employees, foreman Wes Fisher, was employed in a management capacity; and (2) a reasonable jury could find liability based on reckless hiring, training, and/or supervision.

As the court wrote in its earlier Memorandum, there is evidence sufficient for a reasonable juror to conclude that Fisher had been informed that the crane at issue was malfunctioning and that he could have, but did not, contact Maxim maintenance to have the crane taken out of service before Trimboli was injured. (Docket No. 161 at 8.) The TCJA defines "a person employed in a management capacity" to mean "an employee with authority to set policy and exercise control, discretion, and independent judgment over a significant scope of the employer's business." Tenn. Code Ann. § 29-39-104(g)(3). Tennessee caselaw provides little guidance in interpreting that definition, and the language of the definition itself leaves considerable room for ambiguity, particularly with regard to the phrases "set policy" and "a significant scope of the employer's business." Fisher's position was "[c]rane foreman supervisor." (Docket No. 120-12 at 7.) In his deposition, he described that position as being "in supervision." (*Id.* at 28.) He stated that he had "been in charge of a job site" for Maxim before, although that was not his role at the Old Hickory Bridge site. (*Id.* at 59–60.) He testified that he "spend[s] most of [his] time . . . at the yard where they store all of the cranes and have the office." (*Id.* at 42.) He described his responsibilities as follows: "I mainly maintain the yard and get the guys out of the gate in the morning, make sure they got the equipment they need as far as rigging, hard hats, safety glasses, things like that that they may need." (*Id.*) Phone records showed, however, that Fisher was in frequent contact with the operator of the crane on which Trimboli was injured around the time he was injured, and the operator himself testified that he reported the crane's earlier malfunctioning to Fisher. (Docket No. 161 at 6.)

12

The evidence suggests that, although Fisher was not in upper management, he did have a position of authority that allowed him to exercise control and at least some degree of discretion over employees. In this particular instance, he was allegedly the supervisor informed of a problem, and he had the discretion to inform maintenance and pull the crane. The degree to which Fisher's decisions amounted to "set[ting] policy," as discussed in the TCJA, is, to some degree, an issue of semantics; in many businesses, a "policy" is simply a way of doing business, set out over time and over numerous individual instances. The court cannot assume that, merely because Fisher apparently did not issue formal written policies, he was not a policymaker within the company. Similarly, whether his responsibilities encompassed a "significant scope" of Maxim's business may ultimately be in the eye of the beholder. While the court takes responsibility for not addressing the full requirements of Tenn. Code Ann. § 29-39-104(g) in its original opinion, the conclusion that Maxim has failed to show that it is entitled to summary judgment on the issue of punitive damages, at least with regard to Fisher's actions, was not in error.

Similarly, the court finds no error in allowing to proceed, to trial, the argument that punitive damages might be permissible due to reckless training, supervision, or hiring. Testimony from Maxim employees repeatedly showed a general ignorance of the company's own policies and procedures, including procedures, such as the "tag-out" rule, which could have prevented Trimboli's injury. (*See* Docket No. 161 at 8, 36–37.) Maxim appears to have relied substantially on employees to ensure that they themselves were properly trained, without significant pressure, monitoring, or intervention from management. A reasonable jury could find that *laissez faire* approach reckless. There was also evidence sufficient for a reasonable jury to conclude that Maxim hired the operator of the crane on which Trimboli was injured despite the fact that its predecessor company had terminated him for being unable to perform the duties of his job. (*See id.* at 7–8.) These facts may not establish a clear-cut case of recklessness, but they are sufficient to preclude

13

summary judgment on the matter. The court, therefore, will not set aside its earlier determination regarding punitive damages.

**C. Attorney's Fees**

Aptus has requested attorney's fees and costs in the amount of $32,088.32, reflecting $2,648.32 for the depositions of Powers and Wodzinski, $5,220.00 for the physical inspection of the crane on November 13, 2018, and $24,220.00 for the litigation of the sanction motions. (Docket No. 164 at 1–2.) Trimboli seeks attorney's fees and costs in the amount of $47,647.81, reflecting $9,318.75 for the depositions, $17,170.15 for crane inspections, $21,068.75 for the litigation of the motions, and an additional $90.16 in related attorney expenses. (Docket No. 165-2 1–4.) Although Maxim, at this point, does not dispute the imposition of some fees and costs, it does object to particular aspects of the parties' calculations, arguing that a lower sum is appropriate and/or that supplementation of the record is required.

The court enjoys "wide discretion" in awarding attorney's fees, although it cannot stray from the bounds of reasonableness. *Barnes v. City of Cincinnati*, 401 F.3d 729, 746 (6th Cir. 2005). The court must strive to compensate the party awarded fees adequately but not excessively. *See Reed v. Rhodes*, 179 F.3d 453, 471–72 (6th Cir. 1999) ("[C]ourts must remember that they do not have a mandate . . . to make prevailing counsel rich.") (*quoting Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 719 (5th Cir. 1974)). The court's determination of reasonable attorney's fees begins by calculating the "lodestar"—that is, by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *See United States ex rel. Tingley v. PNC Fin. Servs. Grp., Inc.*, 705 F. App'x 342, 348 (6th Cir. 2017). Having made this determination, the court may then, within reason, "adjust the lodestar to reflect other relevant considerations peculiar to the subject litigation." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000)

14

(internal quotation marks and citations omitted). The Sixth Circuit has said that the court may consider a variety of factors in determining the appropriateness of a fee enhancement, including:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Barnes*, 401 F.3d at 745-46 (citing *Johnson*, 488 F.2d at 717-19). In the majority of cases, however, the lodestar amount already reflects these factors within the court's calculation of a reasonable hourly rate and hours billed. *See Gonter v. Hunt Valve Co.*, 510 F.3d 610, 621 (6th Cir. 2007).

Maxim objects to the attorney's fees requested in three regards: first, Maxim argues that the hourly rates for Trimboli's attorneys are unreasonably high in light of prevailing fees in this market and the nature of the case; second, it argues that Trimboli has improperly sought reimbursement for work performed on its Motion for Partial Summary Judgment; and, third, Maxim argues that Aptus has failed to document and justify the large number of hours—138.4—spent on the relevant motions.

The parties rely on the following rates for the calculation of the fees:

| Client | Biller | Role | Hourly Rate |
| --- | --- | --- | --- |
| Aptus | Joseph R. Wheeler | Attorney | $175 |
|  | Paige I. Bernick | Attorney | $175 |
|  | Jason K. Murrie | Attorney | $175 |
| Trimboli | Matthew Wright | Attorney | $500 |
|  | Craig Glenn | Attorney | $250 |
|  | Traci Hannah | Paralegal | $125 |

(Docket Nos. 164 at 1–2; 165-2 at 1.)

Based on the court's familiarity with prevailing practices in this district, it agrees that Wright's $500 is significantly in excess of a reasonable rate for an attorney in a personal injury case. Wright points out his considerable experience and expertise to justify the $500 rate, but he does not refute the fact that this case, though fiercely litigated, is still fundamentally a relatively standard workplace personal injury case. Moreover, if Wright's skills and accolades are truly enough to justify his claimed rate, then they also probably overqualify him for the tasks he performed. In other words, if Wright did reasonably command a $500 hourly rate for any and all work he performed, it would be unreasonable to rely on him, as opposed to a less expensive colleague, for the number of hours of work he provided. The court will, accordingly, reduce his rate to $300. Craig Glenn's rate of $250 is reasonable and will be maintained.[1]

Trimboli argues that his briefing on the Motion for Partial Summary Judgment should be treated as covered by the court order because it was in that motion that it set forth much of the relevant background regarding Maxim's alleged discovery misconduct. A review of Trimboli's motion confirms that that is correct. Trimboli sought summary judgment regarding the TCJA noneconomic damages cap's exception based on the destruction, falsification, or concealment of records. (Docket No. 82-1 at 1–2.) The facts underlying that argument are essentially identical to those relevant to the question of sanctions. Admittedly, some of the relevant work was only necessary to the specific end of obtaining partial summary judgment. For example, Trimboli's time entries, as one would expect, depict some amount of time devoted to the drafting of the Statement

---

[1] Maxim's argument that the rates employed by counsel for Aptus suggest that a comparably experienced attorney in the field would be available for significantly less take no account of the fact that insurance defense firms like Aptus's counsel often charge a reduced hourly rate that has been negotiated with clients who provide a steady book of business.

16

of Undisputed Facts, which would not be a formal requirement for a sanctions motion. (*See* Docket No. 165-2 at 2.) The same facts, however, would have to be presented regardless, and the court sees no reason to assume that the formalities related to a motion for summary judgment required Trimboli's attorneys to expend more time. To the contrary, the back-and-forth associated with statements of undisputed facts and the required responses allow a litigant to force his opponent to respond to specific allegations in a way that may ultimately save time. In any event, the court concludes that allowing Trimboli to claim these hours is necessary to be reasonably compensated for his attorneys' work on sanctions. To exclude the hours would be to exclude much of the work that the sanctions request was built on.

Finally, Maxim challenges the hours spent by Aptus's counsel in drafting its motions and briefing, as well as the adequacy of its documentation of the hours spent. Aptus has provided the hours spent by individual billers on each category for which the court has approved attorney's fees, but, unlike Maxim, it has not broken the billers' work down further into individual time entries. For example, Aptus provides evidence that Bernick spent 18.8 hours on the initial briefing of its Rule 37 motion, but that work is not itemized to describe specific dates or specific tasks such as research, drafting, and proofreading. (Docket No. 164-1 at 2.)

"The party requesting fees bears the burden to submit adequate documentation of the hours reasonably expended," *Plumbers & Pipefitters Local No. 396 Combined Fund v. State Line Plumbing & Heating, Inc.*, No. 4:10 CV 1936, 2011 WL 1769085, at *2 (N.D. Ohio May 9, 2011) (citing *Trustees of the Painters Union Deposit Fund v. Interior/Exterior Specialist, Co.*, 2011 WL 204750 (E D. Mich. January 21, 2011)), and Maxim is correct that what Aptus has provided includes less detail than the court typically requires. To some degree, though, that is largely a difference in form. The court, for example, knows what tasks go into drafting and finalizing a motion and supporting memorandum. Breaking a description down into individual time entries

17

with short task descriptions would provide more information, but not *that much* more. The court would still ultimately have to be guided by its judgment regarding how much time a particular project should take.

Aptus's descriptions, therefore, would not necessarily be fatal to any of its claimed hours, as long as the hours themselves were facially reasonable. Moreover, the effect of Aptus's relatively high hours is offset some by its lower rates. It is not necessarily unreasonable for an attorney to charge a lower rate as a way to be able to devote more time to a task for the same final payment; indeed, a lower-rate-but-more-hours approach would—all else equal—allow for a higher quality of work on behalf of the client, as it would mitigate the need to weigh thoroughness against cost. That said, however, Maxim is correct that Aptus's hours expended are notably high, at least in the context of its lack of detailed documentation.

Aptus asks for the opportunity to file further documentation, possibly *in camera*, to permit more thorough evaluation of its hours. The court, however, already ordered Aptus to file "documentation sufficient to support an award of attorney's fees and costs as ordered" (Docket No. 162 at 2), and this documentation is what Aptus filed in response. The court, moreover, does not see a benefit in allowing these matters—which have already required a lengthy detour from resolving this case on the merits—to extend into an additional round of briefing. Accordingly, the court will reduce Aptus's attorney hours by 30, to bring those hours to a level that the court considers reasonable in light of the limited documentation provided.

In summary, the court will award the attorney's fees and costs in the amounts requested, with the following alterations: (1) Matthew Wright's hourly rate will be revised from $500 to $300; and (2) Aptus's attorney hours spent on motions will be revised from 138.4 to 108.4. Trimboli has submitted documentation for 62 hours of work by Wright, at a rate of $500 per hour, for a total of $31,000; that number will be reduced by $12,400 to $18,600, to reflect a rate of $300 per hour for

18

the same amount of work. The court will therefore reduce Trimboli's originally requested fees by $12,400 from its initial request of $47,647.81, resulting in an award of $35,247.81. With regard to Aptus's fees and costs, a reduction of 30 attorney hours at $175 per hour is a reduction of $5,250 from its initial request of $32,088.32, for a total of $26,838.32.

## IV. CONCLUSION

For the foregoing reasons, Maxim's Motion to Alter Judgment (Docket No. 170) will be construed as motion to reconsider, which will be granted in part and denied in part. The court's order will clarify the scope of the adverse inferences drawn against Maxim as sanctions for its failure to exercise candor with the court during the case management process and its failure to timely provide relevant responsive information during discovery. Aptus and Trimboli will be awarded attorney's fees and costs in the amount set forth in this Memorandum.

An appropriate order will enter.

 ALETA A. TRAUGER
United States District Judge